United States District Court
Eastern District of Kentucky
Central Division at Frankfort

| | | |
|---|---|---|
| MICHAEL DEAN VAUGHAN | ) | Frankfort Civil |
| | ) | Action No. 10-5 |
| vs. | ) | |
| | ) | Frankfort, Kentucky |
| MARY ELIZABETH BRIGHAM | ) | June 28, 2011 |
| | ) | 11:00 a.m. |
| MOVANT:  U.S. ARMY KENTUCKY | ) | |
| NATIONAL GUARD | ) | |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE DANNY C. REEVES

Appearances of Counsel:

On behalf of Plaintiff:          MICHAEL DEAN VAUGHAN, PRO SE
                                 9681 Cloveridge Drive
                                 Independence, KY 41015


On behalf of the Movant:         DAVID E. MIDDLETON, ESQ.
                                 Assistant U.S. Attorney
                                 260 West Vine Street
                                 Suite 300
                                 Lexington, Kentucky  40507


Court Reporter:                  CYNTHIA A. OAKES, CRR
                                 Official Court Reporter
                                 United States District Court
                                 560 Athens Boonesboro Road
                                 Winchester, Kentucky  40391
                                 (859) 983-4346


Proceedings recorded by mechanical stenography,
transcript produced by computer.

THE COURT:  Thank you.

Madam Clerk, if you could call the matter scheduled for 11:00, please.

THE CLERK:  Yes, Your Honor.  Frankfort Civil Action No. 10-5, Michael Dean Vaughan v. Mary Elizabeth Brigham, this matter being called for motion hearing.

THE COURT:  Thank you.  If the parties and counsel could state their appearances.  We'll start with the plaintiff.

MR. VAUGHAN:  Michael Vaughan, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Middleton.

MR. VAUGHAN:  David Middleton, Assistant United States Attorney, representing the Kentucky National Guard and as a part of the United States Department of Defense and also in the limited role on behalf of Dylan Seitz, the attorney against whom the sanctions is filed.

THE COURT:  All right. Thank you.

There are three motions that are currently pending before the Court.  The first motion is a motion for injunctive relief and we'll take that up in just a moment.  There's also a motion for sanctions that was referenced by Mr. Middleton and a motion to continue with respect to the motion for sanctions, and so I'll need to take these up a little bit out of order.

Also, in the order that was recently entered in this matter, I had requested the third party in the case to provide

witnesses if they were available with respect to certain statements that Mr. Vaughan made during the hearing that was held in this matter in September 2010.

Mr. Middleton, the Court is, of course, concerned with statements of the plaintiff that are outlined in a sworn statement that he signed I believe it's August 15th of 2009. As you may recall, during the hearing that was held in September of last year, Mr. Vaughan had disclaimed several of the statements within that sworn statement and had indicated that the statement was made under coercion by certain officers. I believe Major Richardson, if I'm not mistaken, and there's a witness also to the statement. And he also claimed that the statement was made while he was subject to certain medications and, therefore, he attempted to withdraw several of those statements.

Are witnesses available today which can either confirm or contradict Mr. Vaughan's assertions of coercion and that he was under the influence of certain medications?

MR. MIDDLETON: The investigating officer, Major Richmond, is present and is available to testify. Others in his chain of command who ordered the investigation are also present if need be. The medical personnel are not present, but some effort has been made to contact them and determine if they might be available telephonically, and my understanding is that Sallie and Rodkey are hopefully available telephonically. Those are the medical personnel that have been identified.

THE COURT: All right. All right. Thank you.

Before we get to that issue, I do want to turn to the issue of sanctions.

Mr. Vaughan, I'm a little bit perplexed at why you would be filing a motion for sanctions. The issue that you raised through your motion for sanctions was raised in a similar matter just before the September 2010 hearing and I denied the motion at that time. You've raised essentially the same argument that was the subject of your earlier motion and we now have a notice that's been filed with an affidavit attached of Mike Hirte, H-i-r-t-e, which indicates that the matter pending in Washington is basically still an open matter, it discusses the difference between open, suspended, and closed. So my first question for you is, I want to give you an opportunity to withdraw your motion for sanctions if you choose to exercise that.

MR. VAUGHAN: No, Your Honor. Actually, I have a motion here to disqualify and remove from Bar the U.S. Attorney as representing the third party, the Kentucky National Guard. I would like to show you proof of that.

THE COURT: Well, I would like for you to address the question I just asked you.

MR. VAUGHAN: The affidavit?

THE COURT: Yes, sir. I'm giving you an opportunity to withdraw your motion for sanctions.

MR. VAUGHAN:  No, I am not going to withdraw my motion for sanctions.

THE COURT:  All right.  In that event, I will deny the motion.  I will deny the motion to continue as moot, inasmuch as the Court is ruling on the motion.  The Court finds that the motion for sanctions is made in bad faith on behalf of the plaintiff.  This is a matter that was taken up previously by the Court.  I'm sure you have a copy of the hearing, Mr. Vaughan.

MR. VAUGHAN:  Objection, Your Honor, I think it --

THE COURT:  I'm sorry, Mr. Vaughan, you're interrupting me.  Don't do that.

MR. VAUGHAN:  Judge, the affidavit is hearsay.

THE COURT:  Mr. Marshal?  Do we have a Marshal in the courtroom?

THE MARSHAL:  Yes, Your Honor.

THE CLERK:  If you would please sit behind Mr. Vaughan.  It may be necessary that I hold him in contempt.

THE MARSHAL:  Yes, Your Honor.

THE COURT:  Now, Mr. Vaughan, let me explain something to you.  When I talk, you don't talk.

MR. VAUGHAN:  Yes, sir.

THE COURT:  That's the procedure that we follow.  Now, at this point, I'm talking.  And I'll ask you for your comments in just a moment.

MR. VAUGHAN:  Yes, sir.

THE CLERK:  Until I do, zip it up.

MR. VAUGHAN:  Yes, sir.

THE COURT:  All right.  Now, your motion for sanctions is denied as being filed in bad faith.  You have demonstrated a pattern of contact in this case that is punitive, retaliatory, and dishonest, and that's demonstrated once again through your motion for sanctions against Colonel Seitz.

Now, this Court addressed a similar motion, almost identical motion, prior to the last hearing and I told you at that time that if this was an open case in Washington it was a moot point.  It was not relevant to any issues that were then pending before the Court.

Now, you felt the need to renew this and I believe once again you're being punitive and you're attempting to be retaliatory, but you're not being very smart about it.  You demonstrated to me in the last hearing that you're dishonest, and I made that finding.

Now, at this time, I don't see any relevance at all in your motion for sanctions in this case.  So the Court has ruled on the motion, I'm not going to take the motion up again.  The issue of sanctions is not an issue before the Court, so, therefore, there's no reason to proceed on the motion to continue the hearing on the motion for sanctions, because I find that it's been filed in bad faith.

Now, having made that finding, tell me why it is that

you believe the United States Attorney would have some conflict.

MR. VAUGHAN:  Yes, Your Honor.  Here's a copy of the motion.  May I give you a copy of the motion, Your Honor?

Pursuant to Federal Rules of Civil Procedure 21, 24, and 28, United States Code, Section 547, plaintiff respectfully requests this Court to disqualify and bar the United States Attorney from acting as the Kentucky National Guard's representative.  The grounds in support of this motion are as such.

Except as otherwise -- In support of this motion, 28, United States Code, Section 547, states as follows:

Except as otherwise provided by law, each United States Attorney within this District shall prosecute for all offenses against the United States;

Prosecute or defend for the government all civil actions, suits, or proceedings in which the United States is concerned;

Appear on behalf of the defendants in all civil actions, suits, or proceedings pending in this District against collectors or other officers of the revenue or customs for any act done by them or for the recovery of any money exacted by or paid to those officers and by them paid into the Treasury;

Institute and prosecute proceedings for the collection of fines, penalties, and forfeitures incurred for violation of any revenue law, unless satisfied on investigation that justice

does not require the proceedings; and,

Make such reports as the Attorney General may direct.

None of the 28, United States --

THE COURT:  Are you just reading from this?

THE DEFENDANT:  Yes, Your Honor, I am.

THE COURT:  Why don't you summarize it for me and tell me the basis for your request?  Tell me why is it that you're requesting that the United States Attorney's Office not appear on behalf of the third --

MR. VAUGHAN:  The plaintiff is unaware that there's a statute that provides the United States Attorney can represent the third party, Kentucky National Guard.  That is a subset of the Office of the Governor of the Commonwealth of Kentucky. Especially, the United States is not a party in any case that the plaintiff is a litigant in and the United States holds no interest, pecuniary or otherwise.  The Kentucky National Guard, Your Honor, is a subset of the Department of Military Affairs that is attached to the office of the Kentucky governor.  See Kentucky Revised Statute 36.010, which states as follows:

Department of Military Affairs, attached to Office of Governor, functions, organizations:

"The Department of Military Affairs shall be attached to the Office of the Governor, have charge of and be responsible to the Governor for the proper function of the Kentucky National Guard, militia, and all other military or naval matters of the

state. It shall consist of the following offices." I have attached a copy of that exact statute as Exhibit A, your Honor.

This creates an issue in which the United States government is acting as an improper legal representative for the Office of the Governor of Kentucky.

Additionally, Colonel Seitz own stationery attached as Exhibit B does not mention the United States Army, but shows that the Kentucky National Guard is an office of the Commonwealth of Kentucky.

Additionally, the third party in this action, who the plaintiff explicitly subpoenaed, was the Kentucky National Guard. The plaintiff is not a United States Army soldier nor is he subject to the Uniform Code of Military Justice, only the Kentucky Code of Military Justice per KRS 35.

Consequently, the United States is not a proper third party in the matter and the United States has no jurisdiction, authority, or interest in this matter, as the investigation undertaken by the Kentucky National Guard regarding the plaintiff would have had to have been prosecuted under Kentucky law, which is Kentucky Revised Statute 35.0, not federal law.

Therefore, the plaintiff moves that the Court disqualify and bar the United States Attorney from unlawfully representing the Kentucky National Guard and moves the Court to modify the docket accordingly.

THE COURT: All right. Thank you.

Mr. Middleton, would you like to respond briefly?  I know you've just received a copy of this document.

MR. MIDDLETON:  The interplay between the state and the federal government is a complicated one across a broad range of issues.  With respect to the issue of the interplay of the federal and the state authority as it affects the military and, specifically, the Guard and Reserve is even more complicated and difficult.  There is no simple easy answer to when someone acting under the authority of the Guard is federal or state. It's not that simple.  I am operating under the instructions of the United States Department of Justice to represent the Guard today here.  That should be sufficient.

If we were prosecuting him under the Military Code of Justice or under some other federal statute and the substance of the matter was being implicated, that should probably be taken as a serious issue.  But I am a member of the Kentucky bar.  As such, I am present representing a client.  That client is not objecting, the other party is objecting that my ultimate employer would not allow me, but my ultimate employer instructs me to represent the Guard here today.

This is yet another red herring amongst many which is designed to frustrate the course of justice.

THE COURT:  All right.  Thank you.

MR. VAUGHAN:  Your Honor, may I respond?

THE COURT:  No, I don't think it's necessary for you

to respond on this motion.  Before addressing the motion to disqualify, I do want to ask you a few questions, Mr. Vaughan, about your motion for injunctive relief, which relates, as I understand, to the defendant or the defendant's actions and your attempt, as I read your motion, to have the named defendant withdraw statements that were previously made, not statements that are likely to be made in the future, but statements that were made previously.

MR. VAUGHAN:  Yes, Your Honor.

THE COURT:  And as I understand, based upon those statements, there's a proceeding that's scheduled within the next ten days that would somehow affect your ability -- remove your federal recognition as a commissioned officer.

MR. VAUGHAN:  Yes, Your Honor.

THE COURT:  And what is the effect of that, if the military board removes your federal recognition as a commissioned officer?

MR. VAUGHAN:  I would lose my -- most likely lose my security clearance in the job that I currently have, requires a security clearance, Your Honor.

THE COURT:  You have a security clearance?

MR. VAUGHAN:  Yes, Your Honor, I do.

THE COURT:  So that would remove your security clearance, and what would the result of that be?

MR. VAUGHAN:  I would lose my job, because --

THE COURT:  What job do you have?

MR. VAUGHAN:  I work for a -- for the record, I work for the EPA, but I also do work for the Homeland Security, Your Honor.

THE COURT:  What is your position with Homeland Security?

MR. VAUGHAN:  I am assistant administrator for the Department of Homeland Security Research Center in Cincinnati, Your Honor.

THE COURT:  And through that position, you have access to classified or secure information?

MR. VAUGHAN:  Yes, Your Honor.

THE COURT:  Now, you've also attached some materials as exhibits that appear to me to be completely unrelated to your request that the defendant withdraw or retract certain statements that she's made.  And what I would like for you to do is I would like for you to tell me how these attachments are related to your request that the defendant withdraw certain statements.  And it relates to some photographs and some other matters that you've attached.  I'm trying to understand the relevance.

MR. VAUGHAN:  Which exhibit, Your Honor?  Your Honor, which exhibit?  I apologize, I didn't --

THE COURT:  It would be exhibits to your emergency motion for judicial notice and subpoenas, Docket Entry 65, and

13

it would include Exhibit A, which is a photograph, several photographs; Exhibit B, which is a memorandum, the subject line implementation of information assurance best business practice.

MR. VAUGHAN:  Your Honor, I attached those images to show that there was a reason why I was attacked with a 15-6.

THE COURT:  The reason you were?

MR. VAUGHAN:  I was attacked.  That even though the Kentucky National Guard didn't even have jurisdiction, if everything the defendant had said was true, Your Honor, in the 15-6, I was still not subject to any of the punitive measures taken by the Kentucky National Guard.

THE COURT:  Mr. Vaughan, I want to make sure you understand that the Kentucky National Guard is not a defendant in this proceeding.

MR. VAUGHAN:  Understood, Your Honor.

THE COURT:  That you have asked for injunctive relief against the defendant in the case, not based on anything that she's likely to do in the future, but in order to alter her conduct and force her to do something that she otherwise would not do.  And I assume that you're doing that in an attempt to affect the outcome of this upcoming hearing.

Now, my question for you is, how is that information related to your request for injunctive relief against Ms. Brigham?  I don't see the connection.  I don't see why you're asking me --

MR. VAUGHAN:  The motion -- yes, sir.

THE COURT:  I don't see why you're asking me for some type of emergency relief in the issuance of subpoenas in a matter totally unrelated for this request for injunctive relief. I don't see the connection between the two.

MR. VAUGHAN:  Your Honor, the motion for injunctive relief is to prevent the Kentucky National Guard from attacking me with this board hearing.

THE COURT:  Attacking you with what?

MR. VAUGHAN:  The board hearing, Your Honor.  Those three images are indicative of a major operation of security violations.

THE COURT:  So you're attempting to use this proceeding against the named defendant to affect the outcome of a military proceeding?

MR. VAUGHAN:  No, Your Honor.  I'm asking that this Court put it in preliminary injunction until this matter is completed, Your Honor, because it is directly related to the board.

THE COURT:  Well, I'm not going to issue any subpoenas because you haven't shown me that they're in any way relevant to your action against the named defendant in the case.

MR. VAUGHAN:  Understood, Your Honor.

THE COURT:  So if that's what you're asking for, that request is denied.  Now, what we will take up at this time is

we'll take up your request for injunctive relief.  Now, let me just make sure you understand that you've -- I understand you're pro se, that you're not an attorney, and you've demonstrated that throughout the course of this proceeding.  But you cite cases, *Maupin v. Stansbury*, you cite cases from Kentucky, Kentucky law cases, that don't apply under Rule 65 of the federal rules.  You're citing cases for state injunctive relief and you're in federal court.  The standard is different.  So you've made an argument that doesn't even apply -- well, some of the factors apply, but not for the reasons that are set forth in the cases.  You understand that state law is different than federal law in this area?

MR. VAUGHAN:  Yes, Your Honor, I was referring to the Erie Doctrine and how the state law -- this is a court --

THE COURT:  Rule 65 is a rule of procedure.

MR. VAUGHAN:  Yes, Your Honor.

THE COURT:  Erie deals with substantive issues --

MR. VAUGHAN:  Yes, sir.

THE COURT:  -- and substantive law applies.  My question for you is do you understand that under Rule 65, which is a request for injunctive relief, that the federal case law would apply and not the state cases that you've cited?

MR. VAUGHAN:  Yes, Your Honor.

THE COURT:  Well, if you understand that, then why did you cite state authority in support of your request?

MR. VAUGHAN:  Because I was confused as to the state and federal doctrine.

THE COURT:  All right.  Well, tell me as concisely as you can why you believe that this Court should order the named defendant to retract certain statements or change certain statements that she made previously.  That's really the issue before the Court, is your request for injunctive relief to require her to do that.

MR. VAUGHAN:  Because they were false, Your Honor.

THE COURT:  Well, the problem with that is we held a hearing in September and I made a determination at that time that they were not false.  So I've already held a hearing on this and made an initial determination that she was telling the truth and you weren't about who was sending out those messages. I don't see that anything has really changed in that regard other than you filed a second request for injunctive relief. Has anything at all changed since that time?

MR. VAUGHAN:  Yes, Your Honor.  I have had an opportunity to look at a bunch of e-mails, a number of e-mails that Colonel Seitz had given me that day of that hearing and I discovered that there was actually a third investigation -- there appears to have been a third investigation, a forensic investigation done by the Kentucky National Guard.  Moreover, there's other additional information that I would like to discuss after -- if we're going to continue with this and I get

to interview -- or have the witnesses go up, I would like to have the witnesses sequestered so I can continue with that.

THE COURT: Well, we're not at that point yet. Number one, you haven't shown me that you have any likelihood of succeeding on the merits of the case. You haven't shown me that you've suffered or will suffer irreparable injury, you haven't shown me that the balance of harms would tip in your favor, you haven't shown me that there's a public interest that would be served by the issuance of injunctive relief at this time. As a matter of fact, it would appear just the opposite, that if the Court were to interfere with the ongoing proceeding it would be improper under that last factor.

I really don't know what you're attempting to accomplish in this case other than harassment. That's what it appears to be to me at this time. Before we get to the issue of injunctive relief and before I allow you to call any witnesses on that issue, I am concerned primarily with the issue that I raised earlier at the September hearing, and if -- Is it Major Richmond? I apologize if I have the title incorrect.

MAJOR RICHMOND: Present, yes, Your Honor.

THE COURT: All right. If Major Richmond is present, I'm going to call him. I want to get to the bottom of an issue before we proceed any further in the case.

Major Richmond, if you could please come forward and be sworn.

JAMES B. RICHMOND,

having been first duly placed under oath, was examined and testified as follows:

EXAMINATION

BY THE COURT:

Q     Sir, could you state your full name, please?

A     Major James B. Richmond.

Q     It's Major Richmond?

A     Richmond, yes, sir, like the town.

Q     Major Richmond, in a previous hearing that was held in this case, the Court accepted a sworn statement that had been prepared by Michael Vaughan, who's the plaintiff in this matter, on or about August 15th of 2009.  The statement appears to have been sworn in your presence.

A     Yes, Your Honor.

Q     Do you recall the plaintiff giving you a sworn statement at any point?

A     I was acting as an investigating officer on behalf of my commander and I took his sworn statement at that time.

Q     All right.  So you took the statement?

A     Correct.

Q     I'm going to show you a copy of this statement in just a moment and ask you if this is the statement that was taken.

A     Yes, sir.

Q     Before I do that, I want to ask you a few questions about

Mr. Vaughan and how he appeared at the time the statement was taken.  First, do you recall the statement being taken on or about August 15th of 2009?

A    Yes, Your Honor.

Q    Where was the statement taken?

A    In my office in Ashland, Kentucky.

Q    All right.  What was your relationship with Mr. Vaughan at that time?

A    Let's see, he would have been in the S3 shop, he would have been a staff member of my staff.

Q    Now, the day that the statement was taken, had you had the opportunity to observe Mr. Vaughan prior to taking the statement from him?

A    Yes, Your Honor.  He had been in and out all day.  He had fallen that day and was taken to King's Daughter's for review.

Q    That would be the hospital in Ashland?

A    Yes, sir, one block down from the --

Q    So he had fallen, he had an accident, and at some point later he gave his statement?

A    Correct.

Q    Were you able to observe whether Mr. Vaughan was under the influence of any type of medications or alcohol at the time the statement was taken from him?

A    He seemed to have clear speech and have all his faculties about him and he did not make me aware of any barbiturates or

anything of that nature that he would be on.

Q    If it appeared to you that an individual was under the influence of either medication, drugs, or alcohol, would you proceed to take a statement from that person?

A    Probably not.  Especially if they were slurring their speech and things of that nature and they didn't seem to have all the faculties about them.

Q    All right.  But you understood at the time the statement was taken that Mr. Vaughan had fallen, had received medical treatment, but you believed that he was able to give a statement to you; is that correct?

A    My understanding was he was returned to duty.  I'm not sure the entire nature of the injury, but I saw no reason to delay the investigation.

Q    Can you tell me the general nature of the investigation?

A    It's a commander's inquiry.  As you know, Ms. Brigham, Ms. Kounovsky, had contacted me stating that one of our soldiers was acting out -- acting out of -- out of uniform or out of his office, so to speak, and so I contacted our -- my battalion commander, and he said, yes, go ahead and initiate an informal inquiry.  So I was acting on behalf of the commander in taking a look at the situation.

Q    Do you recall whether there was another witness present at the time the statement was taken?

A    I do not.

Q    Do you know an individual named Daniel Griffith?

A    Yes, sir, he was a lieutenant who was serving on the staff at that time.

Q    All right.  Is it common practice to have a witness present when a sworn statement such as this is taken?

A    The witness can basically attest that I adhered to the procedures of the 15-6.

Q    Generally, what are those procedures?

A    Generally, when taking a statement, you state your position and why you're doing the investigation, what the purpose of it is, and then you go over the sworn statement itself, actually understand how to fill it out, if they understand the affidavit at the end.

Q    Do you encourage or in any way suggest that an individual include information within a statement?

A    There were four questions, I believe, I asked, and bear in mind that he was towards the end of the investigation.  There were four questions I needed to understand before I could make a recommendation to my commander.  One was if he had a sexual relationship with her, Ms. Kounovsky-Brigham.  Also if he was the owner or proprietor of a gliddy e-mail account, that could have brought great fidelity to this situation.  And then also outright asking if he had threatened her or made intentions to threaten her.

Q    Is it your practice when you take a sworn statement -- Let

me back up.  Is this the first sworn statement that you've taken from an individual?

A     From this individual?

Q     From any individual.

A     Oh, no.

Q     I assume you've taken several?

A     Yes, sir, I've done many, many 15-6s.

Q     Over your career?

A     Yes, sir.

Q     Is it your practice when you take a sworn statement to in any way coerce an individual into making a statement?

A     Not coerce.  The questions that I had had to be answered clearly to achieve the findings or to find out if indeed he had acted improperly.

Q     Mr. Vaughan stated in the previous hearing held in this case in September of 2010 that some of the statements that are contained in this sworn statement are incorrect, that he subsequently withdrew those statements, and that the reason that he made the statements really were twofold:  One, he was under the influence; and, second, he was coerced by you into making the statements.

      We've talked about whether he was under the influence.  I want to ask you about the second portion of his accusation, which is that you coerced him to make some or all of these statements; is that correct?

A    No, Your Honor.

Q    If he made that statement to the Court, in your opinion, would there be any basis for it?

A    No, Your Honor.

Q    Now, after you took the sworn statement from Mr. Vaughan, did he then sign it in your presence?

A    Yes, Your Honor.

Q    And the statement that he signs at the bottom indicates his name, "I have read or have had read to me this statement," which begins on page one and ends on page three and page three is written in, the number three is written in.  Would he have added that page number or would you have done that, if you know?

A    I don't recall, but I generally don't touch the form itself once -- if I'm the investigating officer.  I make sure that they fill out all portions correctly.  And that's kind of what the witness does also, make sure that the forms are filled out correctly.

Q    And then the typewritten portion continues, "I fully understand the contents of the entire statement made by me.  The statement is true.  I have initialed all corrections and have initialed the bottom of each page containing the statement.  I have made this statement freely, without hope of benefit or reward, without threat of punishment and without coercion, unlawful influence, or unlawful inducement."

     And you're telling me that as you sit here today under oath

that there was no threat of punishment, coercion, or undue influence or unlawful influence or inducement that was applied to Mr. Vaughan in order to cause him to make the statements that are contained in this document?

A    That's correct, Your Honor.

Q    Well, I would like to show you the sworn statement that I have been referring to and I want to call your attention to the last page and ask you if that is your signature on the last page?

A    Yes, Your Honor.

Q    And do you recall -- do you recall receiving that statement from the plaintiff, once again?

A    Yes, Your Honor.

        THE COURT:  All right.  Major, I'm going to ask Mr. Vaughan if he would like to do any follow-up questioning of you at this time.  I may have some additional questions, but I'll give him that opportunity at this time.

        Mr. Vaughan.

        MR. VAUGHAN:  Yes, Your Honor.

                        EXAMINATION

BY MR. VAUGHAN:

Q    Sir, on August 13th you stated that I had fallen and I went to the hospital.  Do you know when I had went to the hospital?

A    Approximately that morning, probably 9:00, 10:00.  I'm -- it was two years ago.

Q    What if I told you that the reason I went was because of a kidney stone?

A    I'm sorry?

Q    Was because of a kidney stone?

A    A kidney stone?

Q    Yes.

A    Okay.

Q    And I was admitted into the hospital at 12:30.  Now, do you know of anyone that went to the hospital with me that day?

A    Not 100 percent, no.

        MR. VAUGHAN:  Your Honor, for the record, Major Draper, who's a state command Chaplin, Specialist Rodkey, the chaplain's assistant, and Specialist Joshua Sallie was a combat medic with the 201st, attended with me at the hospital, Your Honor.  If you like, Your Honor, you can put me under oath and I will testify.

BY MR. VAUGHAN:

Q    What time did you call the plaintiff on that afternoon to report to your office to do the sworn statement?

A    I believe I made you aware days in advance, probably at least the day prior.  I had called you -- I do recall calling you and asking you if you could come in before we went to the dining out, which was that evening.  However, I do believe I was in a QTV or a training group all day and I was unavailable as well.

Q    Absolutely.  Have you ever told the plaintiff that you would take his sworn statement?

A    I'm sorry, I don't understand the question.

Q    Did you order the plaintiff to report to your office and that you would take his sworn statement?

A    When you came into my office, I remember talking to you and saying that I was there as the investigating officer on behalf of the Colonel looking into an accusation from Ms. Kounovsky that you had sent threatening e-mails, posted pornographic photographs of her on various websites, and also was threatening to send those same photographs to her friends and family.

Q    Okay.

A    And that I was there to take your side of the story.

Q    Did you ever notify the defendant in this action that you had enough to convince the battalion commander that he's harassing you prior to even talking to the plaintiff in this action?

A    I don't recall that.

        MR. VAUGHAN:  Your Honor, I would like to submit an exhibit.  I've already given a copy of this to the party over here, opposing party.  I would like to give this to you as well.

        THE COURT:  What is it?  Why don't you tell me what it is?

        MR. VAUGHAN:  These are e-mails that you sent that Colonel Seitz gave to me, specifically –- one of them I

received.  That was the one where you sent it on 2:39 p.m. on August 13th.  If you could give that to him.

THE COURT:  Just give it to the witness.

BY MR. VAUGHAN:

Q    In that e-mail, you gave me the no contact order, you gave me a basic information order that I was not to contact the defendant in any way, shape, or form, and I responded back to you, "May I ask what this is referencing to?"  And then you responded, "You are accused of posting inappropriate photos on various websites, for contacting her ex-husband, it appears within her workspace a mutual acquaintance, and a no contact order is just that, do not contact directly or indirectly, do this and allow me time to conduct my investigation.  I assure you it will be fair.  This is all I will divulge at this point. I will take your statement.  I will take your statement this weekend."  Okay?

Now, you just said that you never stated that -- that you had not made a decision for me.  I have an e-mail here that was sent August 14th at 4:16 a.m. to the defendant.  "I have enough to convince the battalion commander that he is harassing you, and he will leverage KCMJ on him.  Have you considered charging him in civil court?"

A    The purpose of the investigation was to find if you were acting outside your bounds and if you were actually doing conduct unbecoming an officer.  At that time I did have enough

evidence to suggest that you were indeed harassing her.

Q    For conduct unbecoming an officer under what jurisdiction, sir?

A    I don't have the particular KR5, I don't have it memorized, but --

Q    In your 15-6 investigation you specifically state Kentucky Revised Statute 35.457 for conduct unbecoming an officer; is that correct, sir?

A    That's correct, that's the correct KR.

Q    Understood.  Now, I'm confused here.  The defendant in this action stated to you that I had posted photographs and videos of her online.  She sent you -- and I have the e-mails here.  She sent you links to these sites.  Did you visit those sites?

A    I could not visit them from the Kentucky Network.

Q    Do you know of anyone who visited those sites?

A    I went to my home and viewed them and, indeed, confirmed that those sites did exist and photos of her did exist on those sites.

Q    Why wasn't that in the 15-6 investigation?

A    It was not relevant.

Q    Did you visit those very same sites and two of them don't exist and none of the videos or pictures are up?

A    It does not change the fact that you operated outside your bounds and you were conduct unbecoming an officer within the battalion and Army National Guard, Mr. Vaughan.

Q    I understand.  And that's what your take is.  However, in your 15-6 investigation, all of the exhibits and evidence that you suggested was between August 11th and August 14th.  What was my duty status at that time?

THE COURT:  Mr. Vaughan, let me stop you there for a second.

MR. VAUGHAN:  Yes, Your Honor.

THE COURT:  I called this witness for the purpose of determining and confirming whether he coerced you as you alleged during the last hearing that was held in this case and whether you were noticeably under the influence of any drugs or alcohol at the time the statement was given to you, and you're far outside the bounds of that inquiry.  My concern --

MR. VAUGHAN:  Your Honor --

THE COURT:  Let me cut to the chase on this, Mr. Vaughan.  I believe you've lied to me, you have committed perjury in this court by making statements that you were coerced in making this sworn statement.  I don't think that happened.  I don't think you were coerced.  You're given the opportunity to ask this officer questions about that; about the allegations that you made of coercion.  And if I find that -- and I'm leaning toward finding that you did lie to me, you perjured yourself, I'm going to dismiss your case.  You're not going to have a case.  You can take it up with the Sixth Circuit, but you're not going to have a case in front of me.

So the issue that you need be focused on right now is that issue, the allegations that you made about this officer in the last hearing, that he -- when he wasn't present.  So this is your opportunity to ask him questions dealing with the issues of coercion and you being under the influence and making statements that you attempted to withdraw later.  That's the issue.  Now, if you have questions about that, you can proceed with this officer; if not, you're finished.

MR. VAUGHAN:  I would like to present -- show the witness a document.

Your Honor, this is a copy of the sworn statement that you just referenced.  This is a copy of a blank copy.  Also attached is a rights of warning waiver procedures and procedures for investigating officer boards, which is relevant to how I was coerced, Your Honor.

BY MR. VAUGHAN:

Q    Part of doing a sworn statement is that rights and warnings must be taken at the same time.

A    That's incorrect.

Q    In your previous e-mail, you specifically stated that you believed that you had enough to convict me or whatever, to convince the battalion commander that I had harassed her.  You had already made a determination before you took that sworn statement.  In violation of Army Regulation 15-6, you ordered me to report to your office and to do a sworn statement while I was

under the influence of Percocets, Toradol, and morphine.  I have here the original medical records that were sent to me by King's Daughter's hospital that shows that when I was admitted, when those medications were given to me, and if you look at the 15–6 investigation, you specifically stopped taking evidence at 3:00 p.m. on August 15th, but yet you took my sworn statement at 4:15 p.m.  You had already had finished gathering evidence per your own 15–6 investigation.

MR. VAUGHAN:  Your Honor, in 15–6 Manual for Investigations, when it comes to taking sworn statements --

THE WITNESS:  That's in a criminal investigation, Lieutenant Vaughan.

BY MR. VAUGHAN:

Q    No, it's not, it's applicable.

A    Rights warning statement is administered, a D8381 is administered to someone who's under criminal investigation.  You were simply in a commander's inquiry.

Q    At the very bottom it says, "Attach this waiver certificate to any sworn statement, subsequently executed by the suspect or the accused."

Was I accused of anything?

A    You were not.

Q    I was not accused of anything, yet you already said that I was guilty of harassing her.  The 15–6 results stated that I was guilty of conduct unbecoming an officer, did they not, sir?

A    At the end of my investigation after I had taken into account your statement.

MR. VAUGHAN:  Your Honor, the ordering witness is to testify, 15-6 Investigative Manual, 3-7, No. 5, "No military witnesses or military respondents will be compelled to incriminate themselves to answer any question or answer to which would incriminate them or make statement or produce evidence that is not material to the issue."  And since I'm not subject to the Uniform Code of Military Justice, Your Honor, no witnesses or respondents not subject to the UCMJ will be required to make a statement or produce evidence that would deprive them of the rights against self-incrimination under the Fifth Amendment of the Constitution."

Moreover, when it comes to coercion -- of course, I don't have this one --

THE COURT:  Mr. Vaughan, the issue before the Court is whether you made a statement, a written sworn statement, that you were forced to make; in other words, he put words in your mouth, because you later said that's not true, I only said that because he made me do it, he coerced me into doing that.

MR. VAUGHAN:  Your Honor, ordering someone to take a sworn statement is compulsion, especially when you're under the influence of two narcotics and an opiate, Your Honor. Additionally, it violates Army regulations.

THE COURT:  Mr. Vaughan, it could or it could not, but

that's not the issue before the Court.  The issue is not whether this violated part of the military code.  That's not the issue. The issue is whether you lied to me when you said this officer forced you to give incorrect statement, an incorrect written statement, that you would not have done that but for two reasons, he forced you to do it, he forced you to make a false statement, and, number two, you were under the influence.

Now, I believe I explained you to in the last hearing how it's very difficult for the Court to accept your explanation that you were so under the influence that you didn't understand what was going on, but you included so much detail in that statement.  So that doesn't really wash with me, your statement that you were under the influence.  A person can be taking Percocet and other prescribed medications and still be able to understand what they're doing, which appears to be the case here.  So really the issue is whether he forced you to make a statement that was untrue.  Not whether he forced you to make a statement, but whether he forced you to make a statement that was untrue, because that's what you've accused him of doing.

MR. VAUGHAN:  Absolutely, Your Honor.

BY MR. VAUGHAN:

Q    When you took my sworn statement, did you receive a phone from Colonel Hayes?

A    I do not recall.

Q    When did you leave for the ball that evening, the dining

out?

A     5:30, 5:00, I'm guessing.

Q     Did you leave before or after the plaintiff?

A     I can't recall, I honestly cannot.

Q     Did you order the plaintiff to do a sworn statement or not?

A     I did not order you to.  I took your sworn statement.  I gave you the opportunity to speak on your behalf in that part of this investigation.  If you had walked out, it would have been acceptable, the investigation would have been concluded without your statement.

        MR. VAUGHAN:  Your Honor, I found the irrelevant testimony.  It says, "This officer" –– and this is the Court speaking in the transcript, page 26.

        "So this Officer Richmond would have been doing the coaching, is that your position?"  Yes, Your Honor."

        "You're saying that he was putting these words in your mouth, he was advising you that" ––

        This is me speaking.  "He advised me that everybody has threatened someone, you know.  You tell me you didn't threaten her."  That was the quote I said.  Those were –– it was the context of how he spoke to me.  He was asking me these questions.  Everybody is threatening you.  Everybody is threatened in some way.  Did you or did you not?

        Your Honor, I specifically and vehemently denied ever threatening this female.  The images, videos have not been

uploaded, I have proof that they have not. Did he even check them? He said he checked them from home, but he did not put that in the 15-6 investigation, Your Honor. I don't know what else to say.

THE COURT: Mr. Vaughan, I'll make a finding at this time. Number one, that you were not coerced in any way by this officer. Major Richmond did not coerce you into making specific statements that you later attempted to withdraw.

I'll also make a finding that you perjured yourself when you made that accusation in a previous hearing.

The Court believes in this particular case that you just don't get it, you don't seem to understand. When the Court makes a ruling on certain issues, Mr. Vaughan, you just take the shovel and you dig deeper, you get yourself deeper and deeper in a hole.

Not only did you perjure yourself in the last hearing when you made these accusations, you've repeated the perjury here today. Now, of course, that's for the government to make a decision as to whether to prosecute you for perjury. My authority would be to hold you in contempt for continuing to repeat perjured statements in this proceeding.

I don't buy your spin. I understand what you're attempting to do, I read the transcript from the last hearing, and I certainly do understand the points that you were trying to make at that hearing. I don't buy it. I think you lie. I

think you lie to me and I think -- you've acted in this case consistent with the accusations that were made by Ms. Brigham. You don't like the fact that you broke up with her, apparently, and now you want to -- and you wanted to punish her about that. That's entirely consistent with the way you've behaved in this proceeding.  So you're acting very consistent in this matter.

Now, the question before the Court --

And, Major Richmond, you can step down, sir.  Thank you.  And you can -- if you'll give me those two documents. Thank you.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Madam Clerk, if you would mark the copy that I had shown to Major Richmond as Exhibit A to this proceeding.  These are the additional documents that were shown to the witness, you can return those to Mr. Vaughan.

Mr. Vaughan, the issue before the Court at this time, the only issue that remains, is whether the Court should consider your motion for a preliminary injunction.  There are a number of factors that the Court considers in determining whether to issue injunctive relief.  In this particular case, you have acknowledged that you're only seeking to have the defendant retract or withdraw statements that were made previously and they're now before a military proceeding because you're attempting to have those changed statements affect the outcome of that proceeding.

You have to establish irreparable injury to request injunctive relief.  Your argument for irreparable injury is that you will somehow suffer monetary loss, that you will lose jobs or job opportunities as a result of your removal of federal recognition as a commissioned officer.  Ordinarily, monetary loss is not sufficient as a basis for a preliminary injunction, which you've indicated that this would affect one portion of your work.  I don't think it's sufficient, number one, I don't believe that you've demonstrated, you haven't argued sufficiently, that you would suffer irreparable injury, and that's a key factor here.

But the Court also looks at the balances, the harm to the parties in making a determination as to whether injunctive relief is appropriate, because the Court balances all the factors and must consider all factors.  Some are more important than others in particular cases.

In this particular case, when the Court balances the harm, the Court finds that the defendant -- I'm sorry, the third party in the case would be harmed if the Court were to interfere with this proceeding in a number of respects.  Number one, the Court would be reluctant to interfere in an ongoing military proceeding; number two, you've indicated to me that as a commissioned officer that you have access to secure information. I don't believe that you should have access to secure information, but that's for someone else to decide, and the

quicker that decision is made, I believe, the better for the public.

So the issue of harm to the parties, that factor balances in favor of the third party in this particular case.

And keep in mind that your request for injunctive relief is against the defendant, but really what you're seeking to do is you're seeking to interfere with an ongoing proceeding by the third party.  When the Court looks at the public interest that would be served, clearly it would not be served by this Court interfering with that ongoing proceeding.

The likelihood of success on the merits, often a very important factor under Rule 65 that the Court considers.  Based on the testimony I have heard here today, I'm going to take this matter -- the case under advisement, but I will advise the parties I'm likely, very likely, to dismiss this proceeding because of the perjury that's taken place in the case.  I find that this defendant has presented false and perjured testimony to me, he doesn't seem to understand the significance of that, he doesn't seem to understand that he's lost on several motions that he's filed, that he keeps coming back with the same arguments that are unsuccessful.

In short, I don't know that there's any other sanction that would be appropriate other than dismissal of this case.  Dismissal is an extraordinary remedy, it should hardly ever be the sanction in the case, but this is the one case in which

that's the only sanction that would appear to be the appropriate remedy for these ongoing violations that have occurred -- that are occurring as a result of the plaintiff's actions in the case.

So the Court believes that it would not be necessary to accept any additional testimony on the issue of injunctive relief. For the reasons stated, the Court believes that this plaintiff has not demonstrated any irreparable injury or likelihood of success on the merits, there would be harm to the defendant if the Court were to entertain or were to grant any type of injunctive relief in the case, and the public also would be harmed by the issuance of injunctive relief in favor of the plaintiff.

The Court will deny the motion for injunctive relief, it will deny the motion for sanctions for the reasons that were stated at the beginning of the hearing. Mr. Middleton did appear on behalf of Mr. Seitz for a limited purpose of the motion to continue. The plaintiff has not shown the Court that it should disqualify or remove counsel, so his motion to disqualify -- and, Madam Clerk, I don't know if you've received that, but here's the motion.

That motion will be denied as well. The motion to continue would be denied as moot inasmuch as the Court has addressed the issue of sanctions and found that the motion for sanctions was filed in bad faith in violation of the Federal

Rules of Civil Procedure.

The issue of whether the case should be dismissed on the merits as a sanction for the plaintiff's perjured testimony will be taken under advisement and a memorandum opinion will be issued on that matter shortly.

We'll be in recess.

(Proceedings concluded at 12:01 p.m.)

C E R T I F I C A T E

I, Cynthia A. Oakes, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


8/30/2011                          s/CYNTHIA A. OAKES
   DATE                           CYNTHIA A. OAKES, RPR, RMR, CRR




I N D E X

                                                    PAGE

Testimony of JAMES B. RICHMOND:
    Direct Examination by The Court:            18
    Cross-Examination by Mr. Vaughan:           24



E X H I B I T S

Hearing                                            Page
Exhibit No.              Identified             Admitted

   A                        36                     36